NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0102n.06
Filed: February 14, 2008

Nos. 05-2556, 05-2586, 05-2666, 05-2667, 05-2668

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


UNITED STATES OF AMERICA,              :
                                       :
        Plaintiff-Appellee,            :
                                       :
v.                                     :
                                       :      ON APPEAL FROM THE UNITED
WILLIAM EDWARD FLYNN (05-2556),  :      STATES DISTRICT COURT FOR
GEORGE TERRANCE BESSER           :      THE WESTERN DISTRICT OF
(05-2666), JANET MARCUSSE        :      MICHIGAN
(05-2586/2668), DONALD MAYNARD   :
BUFFIN, JR. (05-2667),           :
                                       :
        Defendants-Appellants.         :


Before: ROGERS and SUTTON, Circuit Judges; BERTELSMAN, District Judge.[*]

        BERTELSMAN, District Judge. Defendants-appellants, Janet Marcusse,

George Besser, Donald Buffin, Jr., and William Flynn, appeal their convictions on

charges of mail fraud, conspiracy to commit mail fraud, and money laundering in

connection with their operation of a fraudulent investment scheme. Finding no error in

_____

[*]The Honorable William O. Bertelsman, United States District Court Judge for the
Eastern District of Kentucky, sitting by designation.

the district court's rulings at trial or in its sentencing determinations, we affirm.

I.

A.    Access Financial and Defendants' Roles

From about 1998 to 2002, defendants organized, operated, and promoted an investment business called Access Financial ("Access").  Defendants represented that Access was a successful investment organization with a history of returning large profits to clients and that Access had connections to little-known, high-yield investment opportunities in world markets, which were not available to the general public.

Defendants further represented to investors that their principal would be kept in guaranteed accounts in a major world bank and would not be at risk.  Defendants told investors that Access operated as a tax-free church and that their returns would be non-taxable if they purchased a "church sub-chapter" package from Access.  Many of the investors Access attracted were retirees who transferred their retirement accounts to Access on the representation that Access was eligible to receive such rollovers and that the investors' profits would be tax-free.

Defendants, Janet Mavis Marcusse and George Terrance Besser, were the original organizers and partners of Access.  Defendant Diane Renae Boss was an

assistant and then office manager at Access from 1998 to 2001. She married Wesley Boss in 1999, and he became a sales manager at Access. Wesley and Diane Boss ran the Access office out of their basement from December 1999 to April 2001, when they left the organization.

Defendant Donald Maynard Buffin, Jr. joined Access in 1999 as a salesman and became the office manager in April 2001, when the Bosses left.

Defendant Jeffrey Alan Visser joined the Access sales staff in 2000 and helped run the office when the Bosses left in 2001.

Defendant William Flynn met Marcusse in 1999, and he became her boyfriend. Flynn was a promoter for Access and managed a group of investors from northern Wisconsin.

Defendant David Rex Albrecht was also a promoter of Access and received finder's fees for steering clients to Access.

Between 1998 and 2001, Access took approximately $20.7 million from approximately 577 investors. Investors were required to sign a non-disclosure and confidentiality agreement before receiving details of the investment. Investors received a prospectus-type brochure which described the markets in which Access invested and stated that these alleged markets were recognized and regulated by the U.S. government, Federal Reserve, and International Chamber of Commerce. Investors

3

were told that they would receive a return of as much as 20% on their principal.

Defendants mailed monthly "profit" checks to early investors in Access representing an approximate 10% return on their principal. By 1999, these checks approximated a 3% return. Defendants also told investors that their principal investments were increasing for a total return of 20% per month. These representations were made in periodic newsletters that Access mailed to investors. Defendants also cautioned investors that they would be "thrown out" out of the program if they talked about it to their accountant or the authorities.

By May 2001, defendants had spent almost all of the investors' principal, and Access was about to collapse. Nonetheless, defendants continued to receive additional funds from new investors, based on the same promises of high returns. Defendants received approximately $1 million in new investor funds after May of 2001. In May 2001, defendants held a two-day seminar for investors at which they made many of the same assurances about the security of investors' funds. Defendants also presented a program and speaker conveying the message that the IRS and the income tax laws were not really legal.

In August 2001, Marcusse, Buffin, and Visser went to the police to report that the Bosses had embezzled a substantial sum of money from Access. The detective with whom they met became suspicious of the nature of the organization and asked

defendants for financial records to substantiate their accusations against the Bosses. The records were never produced.

Around the same time, Access began to default on the monthly "profit" payments to investors. Through 2001 and 2002, Access represented to investors, orally and in newsletters, that these delays were temporary and that Access was continuing to invest their funds successfully.

Notwithstanding these assurances, some investors began to demand the return of their principal, without success. Investors who expressed anger at Access staff were told they were being "thrown out" of the program. In December 2001, the Access office closed, leaving investors with no information.

B.     The Federal Investigation

By late 2001, a criminal investigation into Access had begun in the Western District of Michigan, and it became public knowledge in early 2002. Around this time, Marcusse and Visser moved to Missouri but continued to send investors a periodic newsletter, in which they asked investors to be patient. The newsletters threatened investors who cooperated in the investigation that they would risk losing their profits and principal. The newsletters also stated that the government and the courts were conspiring to defraud the investors of their money.

When subpoenaed by the grand jury, Marcusse, Visser, Flynn, and Buffin filed

pleadings claiming that the grand jury had no jurisdiction over them. Marcusse filed various papers challenging the authority of the federal courts and the validity of the income tax laws. When served with a grand jury subpoena for Access's business records, Marcusse took all the Access records from the closed office and disappeared. In July 2004, she was located living in a trailer in the woods in Branson, Missouri. The Access records were never located.

When agents attempted to serve a grand jury subpoena on Besser, he fled into his house and would not answer the door. Shortly thereafter, he sold his house and moved to Mexico, leaving no forwarding address. He was later found living in a villa resort there.

Following an extensive grand jury investigation, federal investigators determined that, of the approximately $20.7 million in investors' funds taken in by defendants, approximately $8.4 million was used to make monthly "profit" payments to lull existing investors and attract new ones. Approximately $4.8 million was diverted by defendants for their personal use, and approximately $7.3 million was dissipated by defendants in other transfers and payments. Defendants used investors' funds to pay everyday bills and to purchase homes, automobiles, airplanes, a bar, and real estate. Defendants reported none of this income to the IRS.

Defendants opened numerous bank accounts into which they deposited

6

investors' funds.  The accounts bore church-like names such as "Sanctuary Ministries" (a nonexistent organization with which defendants claimed Access was related), Discovery Church, Freedom Church of Revelation, Phoenix Ministries, His Will Ministries, and Promised Deliverance.   Defendants also obtained group medical insurance representing themselves to be employees of a church, ministers, missionaries or church staff employees.  However, Access had no church structure, no building, no services, and no activities of a church or religious nature.

Defendants kept no records of their use of investors' funds, and Access had no accountant or financial officer.  The investigation revealed that Access never received any funds from successful investment activity, only from investors.  Access did not keep investors' principal in safe accounts or trusts as represented.

Of the $20.7 million Access received in investors' funds, none was recovered or returned to investors other than the $8.4 million that had been redistributed in "profit" checks.

C.     The Charges Against Defendants and Trial Testimony

On July 29, 2004, defendants were charged in a 40-count indictment with mail fraud and conspiracy to commit mail fraud.  On October 27, 2004, the grand jury returned an 83-count superseding indictment against defendants.  Counts 1-39 charged all defendants with mail fraud in violation of 18 U.S.C. § 1341.  Count 40 charged all

defendants with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1341.

Count 41 charged all defendants with conspiracy to commit money laundering in

violation of 18 U.S.C. § 1956(h). Count 42 charged all defendants with conspiracy to

defraud the United States in violation of 18 U.S.C. § 371. Counts 43-57 charged all

defendants with money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(I). Count

58 charged Marcusse and Boss with money laundering in violation of 18 U.S.C. § 1957.

Counts 59-65 charged Diane Boss and Wesley Boss with money laundering in violation

of 18 U.S.C. § 1957. Counts 66-68 charged Buffin with money laundering in violation of

18 U.S.C. § 1956(a)(1)(B)(I). Counts 69-71 charged Visser with money laundering in

violation of 18 U.S.C. § 1956(a)(1)(B)(I). Counts 72-76 charged Albrecht with money

laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I). Counts 77-80 charged Flynn

with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(I). Counts 81-82

charged Marcusse and Flynn with money laundering in violation of 18 U.S.C. §

1956(a)(1)(B)(I). Count 83 charged all defendants with criminal forfeiture of $10 million.

Defendants were arraigned and all entered pleas of not guilty.[1] Trial began on

May 16, 2005. Three of the defendants -- Albrecht, Diane Boss, and Wesley Boss --

pleaded guilty during the trial.

The testimony at trial included that of an expert, Leonard Zawistowski, a Senior

---

[1]Marcusse refused to respond to the court's inquiry as to her plea. The court thus entered a plea of not guilty on her behalf.

Special Investigator at the Federal Reserve in Washington, D.C. He testified that the investment programs described in the Access sales literature and newsletters do not exist and bore many "badges of fraud," i.e., characteristics common to other fraudulent investment schemes throughout the country. These include extremely high promised rates of return, secrecy, the use of certain terminology describing banks without identifying actual institutions, the representation that the program is recognized by governmental regulatory bodies, and the claim that the investments are not widely available to the public.

Testimony also included that of IRS Special Agent James Flink, who testified in the government's case-in-chief, as well as in rebuttal. Victims of the Access scheme testified about their meetings with defendants and the losses they incurred as a result of their investments in Access.

Defendants Marcusse and Flynn testified in their defense.

Buffin's counsel reserved his opening statement until the close of the government's case in chief. During his opening, Buffin's attorney stated that Buffin would testify that he genuinely believed Access was a legitimate venture and that Marcusse left him "holding the bag" when the scheme collapsed. Buffin's attorney also cross-examined Marcusse along these same lines. Ultimately, however, Buffin did not take the stand.

9

The trial lasted almost five weeks. On June 14, 2005, the jury returned a guilty verdict on all counts against the five remaining defendants.

D.     Sentencing Proceedings

In October 2005, defendants received the following sentences:

Marcusse: 25 years imprisonment, 3 years supervised release, and restitution of $12,651,244.00;

Besser: 20 years imprisonment, 3 years supervised release, and restitution of $12,100,000.00;

Buffin: 15 years imprisonment, 3 years supervised release, and restitution of $8,175,511.00; and

Flynn: 9 years imprisonment, 5 years supervised release, and restitution of $11,700,000.00.[2]

Each of these sentences reflected a downward departure from the Federal Sentencing Guidelines range.

Defendants, Marcusse, Besser, Buffin and Flynn, filed timely notices of appeal. These appeals were consolidated for briefing and argument.

II.

A.     Appointment of Counsel Over Besser's Objection

The first issue we address is Besser's argument that the district court erred when it appointed counsel to represent him over his objection.

---

[2]Although convicted by the jury, Visser has not appealed, and his sentence is not part of the record before us.

This court reviews a district court's denial of a defendant's request to proceed pro se for an abuse of discretion. Robards v. Rees, 789 F.2d 379, 384 (6th Cir. 1986). The question of whether a defendant waived a constitutional right is reviewed de novo. United States v. Ross, 245 F.3d 577, 583 (6th Cir. 2001) (citation omitted).

The Supreme Court has held that a criminal defendant has a constitutional right to waive counsel and to represent himself. Faretta v. California, 422 U.S. 806, 819, 836 (1975). However, the right to counsel "may be waived only by voluntary and knowing action." Martin v. Rose, 744 F.2d 1245, 1251 (6th Cir. 1984) (citations omitted). "Although waiver may be implied and not express, [t]he particular facts and circumstances of each case including the background, experience and conduct of the accused determine whether an intelligent waiver had been made." Id. (internal quotations and citation omitted).

Waiver of the right to counsel will not be "lightly presumed," and a trial judge must "'indulge every reasonable presumption against waiver.'" Boyd v. Dutton, 405 U.S. 1, 3 (1972) (citation omitted).

The trial judge here did not err in concluding that Besser had not made a knowing and unequivocal waiver of his right to counsel. Besser's statements and conduct on this issue are characterized, favorably, as inconsistent, and, not so favorably, as nonsensical.

11

In his initial appearance before the magistrate judge, Besser stated that he did not understand the nature of the charges, and he made cryptic statements apparently in reference to the fact that his name appeared in all capital letters in the indictment. Beyond stating additionally that he would agree to appear only in a "common law venue," Besser refused to answer the magistrate judge's questions on the right to counsel waiver. Concluding that he could not find a knowing waiver, the magistrate judge stated that the court would appoint counsel for Besser.

At his arraignment two days later, Besser stated:

For the record I am presenting myself and do not need to be represented by a unionized bar card member. And I will select counsel of my choice even though he may not well be a bar card member. I will represent myself. It's my Sixth Amendment right to have counsel. I'm retaining those rights.

The magistrate judge's continued efforts to explain to Besser the nature of his Sixth Amendment rights and the need for a knowing waiver were met with similarly inconsistent and nonsensical remarks.

Similar exchanges took place during the initial pretrial appearance and detention hearing. While the attorney then present on Besser's behalf stated to the court that he "thought" Besser understood the hazards of proceeding pro se, the magistrate judge noted that, under applicable law, such a waiver could not be presumed. At a subsequent status conference on the issue of counsel, the magistrate judge again explained to Besser in painstaking detail the reasons the court could not allow him to

12

represent himself unless the court received a knowing and voluntary waiver of his right to counsel. Besser responded first by stating that he did not understand "the nature and the cause of this action." He then digressed into various statements concerning having been kidnapped in Mexico and the court's lack of jurisdiction over him. The court again ruled that it could not find that Besser had knowingly waived his Sixth Amendment right to counsel.

Given this record, the district court did not err in concluding that Besser had not knowingly waived his right to counsel, and it did not err in denying his request to represent himself.

B.      Denial of Motion to Withdraw by Besser's Counsel

Besser next argues that the district court erred when it denied the motion by his appointed counsel to withdraw from that representation.

We review the district court's denial of defense counsel's motion to withdraw for abuse of discretion. United States v. Mack, 258 F.3d 548, 556 (6th Cir. 2001) (citation omitted).

When reviewing a district court's denial of a motion to withdraw or substitute counsel, the court considers: "(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication

13

preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice." Id. (citations omitted).

On March 9, 2005, Besser's court-appointed attorney, Michael Dunn, filed a motion to withdraw or to be re-designated as standby counsel. As grounds, Dunn cited Besser's refusal to communicate and to assist in preparation for trial.

The court heard this motion on March 14, 2005, during a hearing on a motion for continuance filed by other defendants. Dunn stated that Besser would not communicate with him, although he had visited Besser numerous times. In turn, Besser stated that he did not want Dunn to represent him and that he wanted to represent himself, but he then said that he did not understand the nature of the proceedings against him and that he had been "kidnapped out of Mexico on drug charges." The district court judge stated that Dunn's motion to withdraw would be denied.

This ruling was not an abuse of discretion. The only conflict between Besser and counsel was one created by Besser himself. As the evidence discussed above on the Sixth Amendment issue demonstrates, the court rightly concluded that Besser had not knowingly waived his right to counsel and, notwithstanding his refusal to communicate with Dunn, the court had no indication that Besser would behave differently with any other appointed counsel.

As a sister circuit has stated, a "defendant, by unreasonable silence or

14

intentional lack of cooperation, cannot thwart the law as to appointment of counsel."

Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985).

Given the nature of Besser's conduct and the posture of the case before it, the district court did not err in denying Dunn's motion to withdraw.

C.     The Sufficiency of the Evidence

When "'the sufficiency of the evidence is challenged on appeal, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime.'"  United States v. Clay, 346 F.3d 173, 176 (6th Cir. 2003) (citation omitted). "'[T]his court may conclude a conviction is supported by sufficient evidence even though the circumstantial evidence does not remove every reasonable hypothesis except that of guilt.'"  Id. (citation omitted).

A defendant challenging the sufficiency of the evidence thus "bears a very heavy burden."  United States v. Prince, 214 F.3d 740, 746 (6th Cir. 2000) (internal quotations and citation omitted).

1.     The Offenses of Conviction

The essential elements of mail fraud under 18 U.S.C. § 1341 are (1) a scheme to defraud and (2) the mailing of material for the purpose of executing the scheme.  United States v. Stull, 743 F.2d 439, 441-42 (6th Cir. 1984) (citation omitted).  "In order to

15

sustain a conviction, the government must also prove a defendant's intent to defraud." Id. (citation omitted).

"Direct evidence of fraudulent intent is not necessary; where sufficient circumstantial evidence is presented, the jury may properly infer that the defendant was culpably involved from his conduct, statements, and role in the overall operation." Id. (citations omitted).

A scheme to defraud includes "any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." United States v. Jamieson, 427 F.3d 394, 402 (6th Cir. 2005) (citation omitted).

To justify a conspiracy to commit mail fraud conviction under 18 U.S.C. § 371, the evidence must show that the defendant "'knowingly and willfully joined in an agreement with at least one other person to commit an act of mail fraud and that there was at least one overt act in furtherance of the agreement.'" Id. (citation omitted). Further, to establish a conspiracy, "the government need not show an explicit agreement, but merely that the defendant knew the object of the conspiracy and voluntarily associated himself with it to further its objectives." Id. (internal quotations and citation omitted).

The elements of the charged money laundering offenses are:

(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership or control of the proceeds.

United States v. Prince, 214 F.3d 740, 747 (6th Cir. 2000) (citation omitted).

All four appealing defendants argue that there was insufficient evidence to sustain their convictions. Each defendant will be discussed in turn.

2.    Marcusse

The evidence adduced at trial was more than sufficient to sustain the jury's conviction of Marcusse on all counts. The evidence contained in the voluminous trial record was aptly recounted by the district court in its opinion denying Marcusse's motion for judgment of acquittal. The following is a highly compressed summary.

The evidence introduced during the nearly five weeks of trial in this case overwhelmingly showed that Marcusse created, managed, and directed the activities of Access with the intent to defraud investors out of their money. Marcusse made false representations to investors, both directly and through numerous written publications, regarding the success, safety, and legality of the Access financial investments and the church chapter accounts that investors were told to establish for the receipt of their "profits."

The evidence showed that neither Marcusse nor any of the other defendants ever actually invested the victims' money. Rather, in keeping with a classic Ponzi

17

scheme, investors were paid "returns" on their principal from money invested by subsequent victims, and monies not so paid were diverted by defendants for their own personal use. See In re Mark Benskin & Co., Inc., Nos. 94-5421, 94-5422, 1995 WL 381741, at *5 (6th Cir. June 26, 1995) (intent to defraud may be reasonably inferred from nature of Ponzi scheme itself) (citing Conroy v. Shott, 363 F.2d 90, 92 (6th Cir. 1966)).

Marcusse's claim of a good faith belief in the promises made to investors is belied by the evidence. Despite representations that investors' principal was "guaranteed," she knew that those monies were not kept in safe accounts and were not invested in legitimate markets. Indeed, the evidence showed that the markets described in Access's literature did not even exist. When the government's investigation began, Marcusse threatened investors against cooperating with the authorities and, ironically, accused the government of a conspiracy to take investors' money. She further invoked the "nondisclosure" agreements which investors were required to sign before learning details of the "investments." Indeed, the jury could reasonably have inferred that those agreements were a prophylactic attempt by defendants to prevent their fraudulent scheme from coming to the attention of accountants or lawyers who might otherwise have been consulted by would-be investors, and who no doubt would have recognized the true nature of the operation.

18

Further, faced with a grand jury subpoena for Access's records, Marcusse fled with the records, which were never found. See United States v. Jamieson, 427 F.3d 394, 403 (6th Cir. 2005) (evidence that defendant ordered destruction of files after learning of federal investigation supports finding of knowledge of and participation in conspiracy to defraud).

The same evidence supports the finding that Marcusse diverted for her own purposes funds which she knew to be proceeds from this unlawful scheme. Incredibly, in a brief before this court, she states: "The fact that defendants used some of the money invested to reward themselves is also irrelevant to the various charges of mail fraud and money laundering." Such an affront is consistent with Marcusse's asserted view that the federal courts lack jurisdiction over her, that the tax laws are invalid, and that she can conduct herself in any manner she pleases. The jury no doubt perceived this attitude from Marcusse's trial testimony and concluded that, contrary to her assertions of good faith, Marcusse had merely "thumbed her nose" at the law.

3. Besser

Besser argues that the evidence was insufficient to sustain his conviction because it did not show that he participated in many of the overt acts in furtherance of the mail fraud and the conspiracy and that, while he was a signatory on several bank accounts used in the fraudulent scheme, he did not know that the proceeds were from

19

unlawful activity.

Besser's arguments are not well taken. As to mail fraud, the "government is not required to prove that each defendant was a mastermind of the scheme to defraud; proof of a defendant's willful participation in a scheme with knowledge of its fraudulent elements is sufficient." United States v. Stull, 743 F.2d 439, 442 (6th Cir. 1984) (citations omitted). "Nor is a defendant exonerated by the fact that he may have participated in the scheme to a lesser extent than others." Id. (citations omitted).

The evidence showed that Besser had direct involvement in many of the activities of Access directed at securing and processing funds from investors. He was a joint signatory with other defendants in some of the church-named accounts used to shuffle investors' funds; he prepared and signed many of the forms sent to investors, which listed him as "Trustee" and gave his phone number; and he signed some of the fake "profit" checks sent to early investors in the scheme. Further, Besser dealt directly with some of the investors, who testified to statements and promises he made to them.

Further, Besser withdrew approximately $1 million from investors' funds, wiring some of it to Nigeria. He filed a false affidavit in an action brought by authorities in Texas in relation to another fraudulent investment scheme in which he claimed that seized funds were his personal assets when, in fact, they were monies obtained from Access investors. Besser also was notified by one bank that one of the church-named

20

accounts appeared to be a fraudulent tax shelter. That bank later closed the account. Finally, when faced with the grand jury subpoena, Besser fled to Mexico.

This and other evidence was sufficient to support the jury's conviction of Besser on all counts charged.

4.      Buffin

Buffin's claim for lack of sufficiency of evidence is similarly without merit.

The evidence showed that Buffin was a sales manager for a large segment of the Access investor pool. He personally told many investors that the "profits" from their investments were tax-free because Access was a church, and that their principal was guaranteed. Buffin embezzled thousands of dollars of new investor funds, reporting none of that money on his income taxes. Buffin acknowledged to a FBI agent that he realized in 2001 that Access "went bad" but that Marcusse was good at "dangling a carrot" in front of you. Notwithstanding this realization, Buffin continued to receive new investment funds and convert them to his and his co-defendants' use.

Like Besser, Buffin too received a letter from a bank closing his account for suspicious activity. Nonetheless, he opened a new account and continued shuffling investors' funds.

Buffin also participated in the two-day seminar in May 2001, at which defendants falsely reassured investors that Access was earning large profits and that their principal

21

was safe.

Taken together, the evidence was thus sufficient for the jury to find Buffin guilty beyond a reasonable doubt on all counts.

5.     Flynn

Flynn argues that he lacked the specific intent to defraud the investors in Access and that he himself was a victim of Marcusse's fraud. The evidence belies this assertion.

As accurately recounted in the government's brief, the evidence showed that Flynn actively solicited investors for Access; he falsely told them that he had heavily invested in Access and had been highly successful; he set up some of the "church" accounts; he embezzled investor funds for his own use and did not place them in Access accounts; and he wired thousands of dollars to Nigeria, telling the agent that he was a pastor doing missionary work there. Flynn too failed to file any tax returns during the years he was involved with Access.

The jury thus had before it sufficient evidence on which to find Flynn guilty on all counts.

D.     The Testimony of IRS Special Agent James Flink

Buffin and Flynn assert as error on appeal the district court's rulings allowing IRS Special Agent James Flink to testify in rebuttal.

A trial judge's determinations regarding the order of proof and scope of rebuttal testimony are reviewed for abuse of discretion. Benedict v. United States, 822 F.2d 1426, 1428 (6th Cir. 1987) (citation omitted). See also United States v. Caraway, 411 F.3d 679, 683 (6th Cir. 2005).

"Evidence introduced on rebuttal serves to rebut new evidence or new theories proffered in the defendant's case-in-chief, and is not limited by the fact that the plaintiff could have introduced the proffered evidence in his case-in-chief." Id. (internal quotations and citations omitted).

Buffin complains that Flink was allowed to testify about theories that were raised in his counsel's opening statement but about which Buffin never testified due to his change in heart about taking the stand.

After the prosecution had rested, Buffin's attorney gave his opening statement during which he explained to the jury what Buffin would "tell them" when he took the stand as his "main witness." Counsel stated that Buffin would tell the jury that he had truly believed in Marcusse and that Access was "genuine," and that Marcusse had made him "the fall guy." Buffin's attorney thereafter cross-examined Marcusse, conveying the same theme. As it turned out, however, Buffin did not testify.

The government called Agent Flink in rebuttal. The court allowed some of Flink's testimony but also sustained some of defendants' objections thereto. Through Flink,

23

the government introduced pleadings filed by Buffin expressing anti-government and anti-tax views to rebut the assertion that he had held a good faith belief in the legitimacy of Access's activities. The court's ruling allowing such testimony was not an abuse of discretion. See United States v. Goodapple, 958 F.2d 1402, 1407 (7th Cir. 1992) (not error for government to introduce in rebuttal evidence refuting defense raised in defendant's opening statement).

The court likewise did not abuse its discretion in allowing Flink to testify in rebuttal to Flynn's evidence. Flynn took the stand and testified on his behalf, asserting various justifications for his involvement with Marcusse and Access and his use of funds procured through the Access scheme. In rebuttal, Agent Flink testified how he had traced various transactions made by Flynn using Access funds and how that evidence showed that Flynn had used Access funds for his own benefit. This is clearly proper rebuttal, and the court did not err in permitting this testimony.

E.      Exclusion of Testimony as to Marcusse

A trial court's ruling excluding evidence is reviewed for an abuse of discretion. United States v. Stull, 743 F.2d 439, 445 (6th Cir. 1984).

Marcusse argues that the district court improperly denied her request to exclude testimony by one of the victims of the Access scheme. This testimony, Marcusse argues, constituted improper hearsay because the victim repeated statements made by

24

the Bosses, Marcusse's co-defendants, in which they placed blame for the fraud on Marcusse. In fact, however, Marcusse's counsel objected before the witness gave the anticipated testimony. Recognizing the direction in which the examination was headed, the trial judge sustained counsel's objection.

Thus, the court's ruling on this issue did not prejudice Marcusse and was not an abuse of discretion.

### F. Marcusse's Request for Subpoena Expenses

Rule 17(b) of the Federal Rules of Criminal Procedure provides that the court shall order that a subpoena issue for service on a witness sought to be called by an indigent defendant upon a satisfactory showing that the witness's testimony is necessary to an adequate defense. See Fed. R. Crim. P. 17(b).

In making its determination of whether or not issuance of a subpoena is warranted, "the district court is vested with wide discretion." United States v. Moore, 917 F.2d 215, 230 (6th Cir. 1990) (citation omitted). A reviewing court "should not reverse unless the exceptional circumstances of the case indicate that defendant's right to a complete, fair and adequate trial is jeopardized." Id. (internal quotations and citation omitted).

The showing that a witness is "necessary" to a defendant's case is not met by general statements of need lacking in particular facts concerning the substance of the

witness's proposed testimony.  United States v. Rigdon, 459 F.2d 379, 380 (6th Cir. 1972).  Thus, the mere allegation that a witness is necessary for "alibi as well as impeachment purposes" is insufficient.  Id. (citation omitted).

On May 19, 2005, after trial began, Marcusse filed a request for payment of witness fees for thirty individuals, but without explanation as to their necessity.  She subsequently filed an amended request, adding contact information but again providing no facts regarding the witnesses' proposed testimony.  These lists included such individuals as Attorney General John Ashcroft, Federal Reserve Chairman Alan Greenspan, and other federal officials.  The court denied Marcusse's request.

Subsequently, Marcusse submitted another request, this time with explanations of the proposed testimony.  The district court granted in part and denied in part this request.

On appeal, Marcusse challenges the denial of her subpoena request only as to three people: Dr. Reede Hubert, Ed Terlesky, and Richard Williams.  However, the court correctly concluded that, inasmuch as these individuals were involved in matters collateral to the Access scheme at issue in the case, their testimony was not necessary to Marcusse's defense.  The testimony of Williams, who actually ultimately did testify, bore this out, as the government accurately explains in its brief.

The district court thus did not abuse its discretion in denying Marcusse's request

for payment of fees as to these individuals.


G.	The District Court's Sentencing Determinations

This court reviews the district court's sentencing determination under an abuse-of-discretion standard.  Gall v. United States, 128 S. Ct. 586, 597 (2007).  We "first ensure that the district court committed no significant procedural error," and we then consider the substantive reasonableness of the sentence imposed.  Id.

To review for procedural error, this court examines the sentencing transcript to ensure that the sentencing judge adequately considered the relevant factors set forth in 18 U.S.C. § 3553(a) and that he clearly stated his reasons for imposing the chosen sentence.  United States v. Thomas, 498 F.3d 336, 340 (6th Cir. 2007) (internal quotations and citation omitted).

Section 3553(a) provides, in relevant part:

The court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in paragraph (2).... [and] shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for --

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines – [and]

. . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

18 U.S.C. § 3553(a).

"A sentence may be considered substantively unreasonable when the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor."  United States v. Keller, 498 F.3d 316, 322 (6th Cir. 2007) (internal quotations and citation omitted).

Finally, the Supreme Court has recognized that the sentencing judge "is in a superior position to find facts and judge their import under § 3553(a) in the individual case."  Gall, 128 S. Ct. at 597 (internal quotations and citation omitted).

When a defendant's challenge is to the amount of loss under the sentencing guidelines, this court reviews the district court's calculation for clear error.  United States v. Sosebee, 419 F.3d 451, 455 (6th Cir. 2005) (citation omitted).

Further, the district court's interpretation of the United States Sentencing Guidelines is reviewed de novo. United States v. Kosinski, 480 F.3d 769, 774 (6th Cir. 2007).

Defendants Marcusse, Besser, and Buffin appeal various aspects of their sentences. Besser argues that the district court improperly found him accountable for the loss caused to all victims. As outlined above, however, Besser actively participated in the fraudulent activities of Access. As this court has held, it is clear under the sentencing guidelines that "a conspirator is liable for the acts and omissions of his co-conspirators that are reasonably foreseeable and in furtherance of the conspiracy." Id. (citation omitted). The total loss incurred by the victims of the conspiracy is thus properly attributable to Besser. Id.

Likewise, Besser's contention that the court erred in finding that he was an "organizer or leader" is not well taken. As noted, Besser was a signatory on many of the Access accounts, appeared personally at sales meetings where he was identified as Marcusse's "partner," and dealt personally with large investors.

Besser's objection that the scheme did not involve "sophisticated means" is likewise belied by the evidence of the complex, carefully planned scheme involving numerous bank accounts and financial transactions.

Finally, Besser's objection that his sentence is unreasonable is without merit.

29

The district court found Besser's guideline level to be 43, which calls for a life sentence. The court, noting Besser's ill health and age and the need for proportionality with the sentences imposed on his co-defendants, instead varied downward and sentenced him to 20 years imprisonment.

Marcusse too argues that her sentence was unreasonable. Again, however, the guideline calculation called for a sentence of life imprisonment, but the district court sentenced Marcusse to 25 years imprisonment. The court reached this determination after reviewing the pertinent factors under § 3553(a) and noting particular characteristics of Marcusse's situation. Its determination was not unreasonable.

Finally, Buffin challenges his sentence. He argues that he should have been held responsible only for the money he actually received from the fraudulent scheme rather than for the total loss incurred by the victim investors. Such an argument has been rejected by this court. See United States v. Wolfe, 71 F.3d 611, 617 (6th Cir. 1995).

The record shows that the district court adequately calculated the loss attributable to Buffin based on the time period during which he was involved in the scheme. The court also correctly determined that Buffin was a "leader" based on his role in the activities of Access. On the basis that Buffin was not as culpable as Marcusse and Besser, however, the district court sentenced him to 15 years

imprisonment, substantially below the guideline range of 324 to 405 months.  This sentence clearly withstands "reasonableness" review.

III.

For the foregoing reasons, we affirm the judgment of the district court.