NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0698n.06

No. 10-6410

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jun 29, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| CHRISTOPHER CRAMER, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: SUHRHEINRICH, MOORE and CLAY, Circuit Judges.

**SUHRHEINRICH, Circuit Judge.** Defendant Christopher Cramer appeals his conviction for possession of a shank, a prohibited object in violation of 18 U.S.C. § 1791(a)(2). For the reasons stated herein, we **AFFIRM.**

## I. Background

Defendant Christopher Cramer (Defendant) is a prisoner currently incarcerated at a federal penitentiary in McCreary, Kentucky (McCreary). Following an altercation with fellow inmate James Cosgrove in November, 2008, a federal grand jury issued a four-count indictment charging Defendant with the following:

Count 1: Assault with intent to murder within the maritime and territorial jurisdiction of the United States in violation of 18 U.S.C. § 113(a)(1);
Count 2: Assault with a dangerous weapon with intent to do bodily harm, in violation of 18 U.S.C. § 113(a)(3);
Count 3: Assault with serious bodily injury, in violation of 18 U.S.C. § 113(a)(6);

1

Count 4:   Possession of a shank, a prohibited object, in violation of 18 U.S.C. § 1791(a)(2). Defendant pleaded not guilty, claiming he stabbed Cosgrove in self-defense, and proceeded to trial.

Both men testified at, but their accounts were contradictory.

Defendant testified that he and Cosgrove were members of different white supremacy prison gangs and that Cosgrove wanted to kill Defendant because Defendant had been involved in a fight against members of Cosgrove's gang during his incarceration at a federal prison in Victorville, California.  According to Defendant, Cosgrove had repeatedly threatened him in the weeks leading up to their altercation, at one time telling him in the prison yard that his "time [was] near" and that he was "going to be a dead man."

Defendant testified that on November 29, 2008, Cosgrove approached him on the second floor of the prison, removed a shank from his pocket, and again told Defendant he was "a dead man." Defendant said he immediately reached for the shank and took possession of it in ten to fifteen seconds.  According to Defendant, Cosgrove "[t]hen . . . started cussing at me.  While he's cussing at me, he's walking towards the opposite way [to go down the stairs].  He's telling me . . . [d]on't go nowhere, that I'm a dead F-er, that he's got something for me; he'll be back with more people. Don't go nowhere, this is it . . . ." *Id*. at 152*.*  Defendant claimed that although Cosgrove was physically retreating, he still felt threatened and decided to take the opposite way down the stairs to meet up with Cosgrove "to stop him from whatever he was going to do . . . ." *Id*.

Defendant said he caught up to Cosgrove on the stairwell connecting the two prison floors; where the two argued.  Defendant also admitted holding the shank up to Cosgrove's midsection and throat, but claimed he only raised it in a threatening gesture when he realized there was "no hope in diffusing the issue" and saw that Cosgrove had "supporters" near him.

2

At this point during Defendant's testimony, a prison surveillance video was played for the jury, capturing the subsequent series of events.[1] The video was not clear enough to show which man escalated the altercation, but showed Defendant and Cosgrove tumbling down the stairs together. Defendant initially identified himself as being "on top" of Cosgrove "trying to stop it" while Cosgrove was punching him from below, after which Defendant identified Cosgrove "flipp[ing] [him] over" and positioning himself (Cosgrove) on top. *Id*. at 158. Defendant testified that he "just knew that he was attacking me, and that I had to defend myself at that time." *Id*. at 159. Defendant admitted that he stabbed Cosgrove approximately thirty-seven times before a prison guard hit Cosgrove with a chair to get him off of Defendant.

Cosgrove testified that he did not remember much about the incident. He said that he was not affiliated with a gang, had never possessed a shank while at McCreary, and had no idea why Defendant wanted to kill him. In fact, he said that he did not recall having a single conversation with Defendant, although this claim was undermined by the allegation that he told a nurse administering medical treatment that the dispute was a "personal issue" between the two of them and that he "got hit by the D.W.B.'s [Dirty White Boys]. They got a contract on my life." Cosgrove indicated that on the day of the altercation, Defendant and several other men tried to lure him into a cell on the prison's second floor. When he pushed his way through them and ran down the stairs, Defendant cut him off. Cosgrove testified that he was trapped because other inmates were blocking the way back up the stairs. He said he only remembered being attacked by Defendant and then being hit with a chair by the prison guard.

---

[1]Video surveillance of the events preceding Defendant and Cosgrove's meeting in the stairwell was unavailable and was not shown to the jury.

The jury acquitted Defendant on Counts 1, 2, and 3 (the assault charges) but convicted Defendant of Count 4, possession of a shank, a prohibited object in violation of 18 U.S.C. § 1791(a)(2). He was sentenced to two (additional) years in federal prison. Defendant appeals.

## II. Analysis

### A. Voir Dire

Defendant first claims that the district court erred by denying his motion to voir dire the jury with three questions related to his claim of self-defense. Specifically, Defendant says the court deprived him of an impartial jury by refusing to ask prospective jurors whether they (1) "believe[d] a person does not have the right to protect themselves from an attack of another;" (2) "believe[d] in a prison setting a prisoner does not have the right to protect himself from the assault of another inmate"[;] and (3) "underst[ood]and agree[d] with" the fact that the government carried the burden to prove its case against Defendant.

The Sixth Amendment guarantees that an accused will be tried by an impartial jury. U.S. Const. amend. VI. The trial judge is tasked with empaneling the jury and we accord the court's determination great deference. *Wainwright v. Witt*, 469 U.S. 412, 426 (1985). The trial judge "retains great latitude in deciding what questions should be asked on *voir dire*." *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991). Hence, "[s]o long as the court ensured that the defendant or defendants had a fair trial by a panel of impartial, indifferent jurors, reversal is not mandated," *United States v. Phibbs*, 999 F.2d 1053, 1071 (6th Cir. 1993) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted)).

The district court thoroughly explained its rationale for denying Defendant's motion. As for the first two proposed questions, the court found them redundant and slightly argumentative in light

4

of the court's other voir dire questions asking whether the jury members would apply the law as instructed, regardless of their personal feelings. For the same reason, the court found that Defendant's self-defense-specific questions were tailored to elicit jurors' receptiveness to Defendant's theory of the case, more than the jurors' ability to be fair and impartial. Insomuch as it asked whether jurors "agreed with" the assignment of the burden of proof in the case, the court found that Defendant's third proffered question suffered the same flaws. The court declined to ask Defendant's question both because the court had already established the jurors' understanding of and willingness to apply the burden of proof and because further elaboration on burden issues was more appropriate during jury instructions, after the parties' proofs had been submitted.

Defendant claims that his proposed voir dire questions were "constitutionally compelled." We have held, however, that "[a] proffered *voir dire* question is not constitutionally required simply because it 'might be helpful in assessing whether a juror is impartial'; instead a question is constitutionally compelled only where the 'failure to ask that question . . . renders the defendant's trial fundamentally unfair.'" *Beuke v. Houk*, 537 F.3d 618, 637 (6th Cir. 2008) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991)) (internal alterations omitted). Under this standard, we find that the district court did not abuse its generous discretion in refusing to ask Defendant's requested questions. The jurors had already been apprised of the relevant law and of Defendant's theory of self-defense, and had promised to apply the law as it was explained to them. As such, Defendant's proposed inquiries regarding the jurors' personal agreement with the law of self-defense were repetitious, unnecessary, and potentially confusing. Defendant's requested question on the jurors' agreement of the United States' burden of proof would also have been confusing because the jurors had already affirmed their ability to apply the burden appropriately. As the court also explained to

5

defense counsel, repeatedly injecting burden issues before any proofs had been made was inappropriate and had the potential to be misleading.

The court's voir dire assured that Defendant received a fair and impartial jury, which is the only constitutional mandate applicable in this case. Because Defendant had no additional right to repeat already-asked questions or probe the jury for its most sympathetic members, we reject Defendant's claim on this issue. *See Phibbs*, 999 F.2d at 1070-72 (rejecting the defendant's claim that a submitted juror questionnaire was "necessary to ferret out those prospective jurors whose biases would not be revealed through a collective examination" because it found that while the questionnaire "might have aided defendants in identifying sympathetic jurors, it was not needed to compose a fair-minded jury").

## B. Jury Instructions

Defendant next asserts that the district court erred in refusing to issue the Sixth Circuit Pattern Instruction on self-defense, instead issuing a lengthier instruction Defendant claims was confusing, misleading, and prejudicial.

We review a district court's failure to give a requested jury instruction for abuse of discretion. *United States v. Blanchard*, 618 F.3d 562, 573 (6th Cir. 2010). Although a defendant is generally entitled to some jury instruction on his reasonably supported theory of the case, he "has no right to select the particular wording of a proposed jury instruction." *United States v. McGuire*, 744 F.2d 1197, 1201 (6th Cir. 1984) (internal quotation marks omitted). Rather, we look to the jury charge "as a whole to determine whether the charge fairly and adequately submit[ted] the issues and law to the jury." *United States v. Heath*, 525 F.3d 451, 455-56 (6th Cir. 2008) (citing *United States v. Buckley*, 934 F.2d 84, 87 (6th Cir. 1991)). "A trial court's refusal to give a requested jury instruction

6

is reversible error only if the instruction is (1) correct, (2) not substantially covered by the actual jury charge, and (3) so important that failure to give it substantially impairs defendant's defense." *Id.* (quoting *United States v. Sassak*, 881 F.2d 276, 279 (6th Cir. 1989)). Reversal is warranted "only if the instructions, viewed as a whole, were confusing, misleading, and prejudicial." *Id.* at 456 (citing *United States v. Clark*, 988 F.2d 1459, 1468 (6th Cir. 1993)).

Defendant requested that the district court instruct the jury with the Sixth Circuit Pattern Instruction for Self-Defense:

> (1) One of the questions in this case is whether the defendant acted in self-defense. This defense may apply to all 4 of the charges against the defendant.
>
> (2) A person is entitled to defend himself against the immediate use of unlawful force. But the right to use force in self-defense is limited to using only as much force as reasonably appears to be necessary under the circumstances.
>
> (3) The government has the burden of proving that the defendant did not act in self-defense. For you to find the defendant guilty, the government must prove that it was not reasonable for him to think that the force he used was necessary to defend himself against an immediate threat. Unless the government proves this beyond a reasonable doubt, you must find him not guilty.

*See U.S. v. Dobbins*, 1990 WL 166427 (6th Cir. 1990). Instead, the district court issued a longer, more detailed instruction requested by the United States and quoted and upheld by this Court in *United States v. Guyon*, 717 F.2d 1536, 1541-42 (6th Cir. 1983) (quoting the jury instruction and finding that "[t]his charge clearly gave the jury the right and the duty to find [defendant] not guilty if the members of the jury believed him."). While this instruction tracked the language of the Sixth Circuit Pattern Instruction in explaining the basis of the defense and the government's burden of proof, it also explained the circumstances in which the defense was available. Thus, it outlined more fully the other prerequisites for the defense including, *inter alia*, that "[i]n order for a defendant to

7

have been justified in the use of force and self-defense, he must not have . . . provoked the assault on him or been the aggressor" and "[m]ere words without more do not constitute provocation or aggression." Moreover, while the pattern instruction indicated that a person was justified to defend himself against "the immediate use of unlawful force," the issued instruction stated that "[t]he circumstances under which a defendant acted must have been such as to produce in the mind of a reasonably prudent person similarly situated the reasonable belief that someone was then about to harm him or do him serious bodily harm. The district court further instructed that "a defendant must have actually believed that he was in imminent danger of serious bodily harm[], and that force was required to repel it." *Id.* at 263.

Defendant does not quarrel with the correctness of the statements of law found in the issued jury instruction, nor does he contest that the issued instruction is substantially similar to the Sixth Circuit Pattern Instruction.[2] *See Heath*, 525 F.3d at 456. Instead, he argues that "the District Court's instruction on self-defense was confusing, misleading and prejudicial because . . . it added additional elements not required by the Sixth Circuit." *See id.*.

Defendant fails to show how the addition of a legally accurate but more detailed explanation of the conditions for raising self-defense in the Sixth Circuit was misleading or confusing. The issued instruction established the elements of self-defense and the circumstances in which it was available without relieving the United States of its burden of proof. *Cf. Berrier v. Egeler*, 583 F.2d 515, 518 (6th Cir. 1978) (finding reversible error when the trial judge issued a confusing and misleading instruction implying that the defendant had the burden of proof in his claim of self-

_____

[2]Defendant's appellate counsel admitted at oral argument that none of the statements within the issued jury instruction were legally inaccurate and that the instruction applied to all four counts.

defense and that the defense was unavailable if he could have retreated from his attacker, an incorrect assertion under applicable Michigan law). Defendant similarly fails to show how the issued instruction was prejudicial. He cites no authority establishing that a jury instruction must err on the side of generality, or that it must be shorter rather than longer. In fact, the opposite is true, as we require only that the jury charge be accurate, substantially similar to the defendant's proffered instruction, a fair presentation of the issue to the jury. *See Heath*, 525 F.3d at 456.

Accordingly, we conclude that the issued jury instruction was not unduly confusing or prejudicial. *See Cherry v. Jago*, 722 F.2d 1296, 1300 (6th Cir. 1983) (upholding conviction where jury charge was somewhat confusing and "not perfect" on the issue of self-defense because "[t]he[] jury instructions, read as a whole, [were] not so confusing or unfair that they violate[d] the defendant's due process rights."). We nonetheless take this opportunity to advise the trial courts within this jurisdiction to issue the Sixth Circuit Pattern Instruction in future cases, in order to ensure greater clarity and consistency in jurors' understanding of the elements necessary to prevail on a claim of self-defense.[3]

### C. Jury Verdict

Third, Defendant claims that the jury's verdict is inconsistent and must be reversed, arguing that it is illogical for the jury to have found that Defendant was justified in using deadly force against Cosgrove but wrong to possess the very weapon used to apply that force.

---

[3]Defendant also complains that the district court failed to accurately present his theory of the case to the jury. In fact, the district court read Defendant's theory of the case almost exactly as submitted, save minor grammatical changes and the elimination of redundant or obvious phrases. His claim on this issue is rejected.

Generally, inconsistent verdicts are not subject to review, partially because "a jury that inconsistently convicts the defendant of one offense and acquits him of another is as likely to have erred in acquitting him of the one as in convicting him of the other." *United States v. Lawrence*, 555 F.3d 254, 261-62 (6th Cir. 2009) (citation and internal alterations and quotation marks omitted). Nevertheless, in rare circumstances inconsistent verdicts will be overturned when they are the result of "arbitrariness or irrationality." *Id*. at 263.

The jury's verdict in this case was not inconsistent, much less the product of arbitrariness or irrationality. *See id*. Defendant testified that he wrestled Cosgrove for the shank and easily gained possession of it. Defendant then explained that although Cosgrove was retreating, he felt he needed to "diffuse" the situation and ran after Cosgrove with the shank in his hand. Even if the jury believed that Defendant did not initially possess the shank but stole it from Cosgrove, the jury could have logically found that Defendant was nevertheless wrong to retain possession of it. Alternatively, the jury may have credited Cosgrove's testimony identifying Defendant as the original possessor of the shank. In either instance, however, the findings are not necessarily inconsistent with the jury's belief that once the fight between the men erupted, Cosgrove became the aggressor and Defendant acted in self-defense.

In the alternative, Defendant urges us to review the sufficiency of the evidence underlying the jury's guilty verdict on the single count of possession of a prohibited object. *See Lawrence*, 555 F.3d at 268-69 ("[P]rotection from demonstrated juror irrationality is still available through appellate review of the sufficiency of the evidence.") (citing *United States v. Powell*, 469 U.S. 57, 67 (1984) and *Getsy v. Mitchell*, 495 F.3d 295, 307 (6th Cir. 2007) (en banc)). For the stated reasons,

10

however, we find that sufficient evidence was adduced at trial—indeed, by Defendant's own testimony—to support the jury's verdict.

### D. Makeup Artist

Defendant's final substantive claim is that the district court erred in refusing to appoint a professional make-up artist to camouflage potentially offensive tattoos over his face and neck, including: a sketch of Adolph Hitler; a sketch of Bob Matthews, founder of the "New World Order" white supremacy group; and two swastikas. Defendant does not dispute that he wilfully acquired these tattoos. Nonetheless, Defendant claims his tattoos made him less attractive and more frightening than an average defendant and argues that being forced to appear for trial in his normal state deprived him of a fundamentally fair trial.

Pursuant to 18 U.S.C. § 3006A(e)(1), a district court has authority to approve an indigent defendant's request for "investigative, expert, or other services" necessary to his defense.[4] 18 U.S.C. § 3006A(e)(1). In order to obtain the desired services, a defendant must show that "(1) such services are necessary to mount a plausible defense, and (2) without such authorization, [his] case would be prejudiced." *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). We review the denial of a services request under § 3006A(e)(1) for abuse of discretion. *Id*.

The district court's decision to deny Defendant's motion was not an abuse of discretion. First, the court asked the jury during voir dire whether Defendant's tattoos would prevent them from being fair and impartial:

> Let me note that the defendant as you have observed [Defendant] has extensive tattoos on his neck, on his face, on his head. Let me see if that fact raises any particular concerns for any of you, and let me just say if you want to raise that and

---

[4]The United States does not contest that Defendant is indigent.

11

I'd encourage you to do so if you need to, we'll follow up on that at the bench in terms of any follow-up questions. Does that raise a concern with anybody? Does everyone (sic) feel like they could be fair and impartial in reaching a verdict? Okay.

Although defense counsel was originally reticent to voir dire the jury on this issue for fear it would attract more attention to Defendant's tattoos, the district court was sensitive to these concerns and its approach was effectively crafted to identify juror prejudice without creating it. As the court explained to defense counsel, the court purposefully saved its voir dire questions on Defendant's tattoos until the end of questioning "because I wanted there to be a period of time in which . . . the jury . . . [had] been in the presence of the defendant given his tattoos" and so that "I would not have to bring too much attention to it (sic)[.] I didn't want to make it sound like something extraordinarily out of the ordinary so I used [the] question that we agreed to and . . . did a general follow up about being fair and impartial . . . ." *Id*. at 146. Indeed, defense counsel indicated that he was satisfied with the panel's reaction: "Judge, regarding the issue of the tattooing, I don't have anymore questions that I would like the court to raise. There didn't seem to be an issue with the panel." *Id*. at 147.

Additionally, the case law Defendant cites in support of his claim is inapposite. The two Supreme Court cases on which he relies, *Estelle v. Williams*, 425 U.S. 501 (1976) and *Holbrook v. Flynn*, 475 U.S. 560 (1986), do not affirm the proposition that allowing Defendant's tattoos to be visible during trial was unfair or prejudicial. In *Williams*, the Court established the now-recognized rule that defendants cannot be forced to appear for trial in prison clothing, acknowledging that the "clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Williams*, 425 U.S. at 505. Similarly, in *Flynn*, the Court held that deployment of numerous security personnel into the defendant's

12

courtroom was inherently prejudicial and, like shackling a prisoner during trial, could be permitted only in the face of an essential and specific state interest. *Flynn*, 475 U.S. at 568-69. As the Supreme Court itself has noted, however, *Williams* and *Flynn* relate only to prejudice resulting from state-sponsored activities, not private-actor conduct. *See Carey v. Musladin*, 549 U.S. 70, 76 (2006) ("[P]art of the legal test of *Williams* and *Flynn*-asking whether the practices furthered an essential *state* interest—suggests that those cases apply only to state-sponsored practices.") (footnote omitted). Although Defendant cites our decision in *United States v. Crane*, this too is inapposite because it dealt, like *Williams* and *Flynn*, with potential prejudice resulting from state-sponsored activity. *See United States v. Crane*, 499 F.2d 1385, 1388-89 (6th Cir. 1974) (distinguishing the inherent prejudice of a defendant being shackled in a courtroom for an extended duration from the mere fact that jurors briefly observed the defendant in shackles inside the courthouse). Defendant readily admits that the state did not sponsor his tattoos and we find that Defendant's choice to alter his natural appearance is the very type of private-actor conduct that typically operates outside of the government's control and responsibility. *See United States v. Quintero*, 1991 WL 80573, No. 90-50563 (9th Cir. May 15, 1991) (holding that *Williams* "cannot be stretched" to apply to the defendant's claim that the court deprived him a fair trial by disallowing him to wear a long-sleeve shirt to trial to cover his tattoos because, *inter alia*, *Williams* "involved [a] defendant[] compelled *by the state*" to appear for trial in prejudicial prison clothing (emphasis added)).[5] Although these cases do not rule out the possibility that private-actor conduct could render the circumstances of a trial inherently prejudicial, Defendant has not presented such a case. *Cf. id.*

---

[5]This unpublished decision also appears in a "Table of Decisions Without Recorded Opinions" in the Federal Reporter. It appears there as *U.S. v. Quintero*, 933 F.2d 1017 (9th Cir. 1991).

13

Moreover, Defendant fails to satisfy *Gilmore*'s two-prong test for the appointment of professional services. *See Gilmore*, 282 F.3d at 406 (holding that for professional services to be appointed, a defendant must have shown that they were necessary to his defense and that he was prejudiced by the district court's failure to authorize them). First, the service of a makeup artist to cover Defendant's tattoos was not indispensable to his ability to raise a plausible defense. The fact that the jury acquitted Defendant of three of the four charges against him is enough to undermine any claim to the contrary. Second, Defendant cannot show that he was prejudiced by the district court's ruling. In *Flynn*, the Supreme Court held that the district court must look at the scene presented to the jurors to determine whether what the jurors saw was so inherently prejudicial that it posed an unacceptable threat to the defendant's right to a fair trial. *Flynn*, 475 U.S. at 572. The Court noted that this was a high standard and one not easily reached, adding that the circumstances at trial must leave the defendant branded "'with an unmistakable mark of guilt'" in the eyes of the jurors. *Id*. at 571 (quoting *Williams*, 425 U.S. at 518 (Brennan, J., dissenting)). Again, the jury's acquittal on the majority of the charges against Defendant is a clear indication that his tattoos did not affect the jury's ability to impartially weigh the evidence presented. Accordingly, we reject Defendant's argument that the district court's refusal to provide a professional makeup artist deprived him of a fundamentally fair trial.

### E. Cumulative Error

Defendant's final claim is that the district court's cumulative errors justify reversal of his conviction. To obtain reversal on the basis of cumulative error, we have held that "a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). "[E]rrors that

14

might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair." *Id*. (internal quotation marks and citations omitted). Nevertheless, cumulative error cannot lie where individual errors do not exist. *See United States v. Wheaton*, 517 F.3d 350, 372 (6th Cir. 2008) (holding that the cumulative error analysis looks to "actual errors, not non-errors"). Because we find that Defendant's substantive contentions lack merit, we reject Defendant's cumulative error argument.

## III. Conclusion

For the foregoing reasons, we **AFFIRM** Defendant's conviction and sentence.