NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0427n.06

Case No. 22-3538

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Oct 06, 2023 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| BRIAN HIGGINS, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: COLE, READLER, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Brian Higgins diverted for personal use funds he received from his mortgage servicer to repair damage to his home caused by a broken fish tank. He also filed a lawsuit against two witnesses for the prosecution, accusing them of misdirecting the funds instead of himself. For his conduct, a jury convicted Higgins on three counts of mail fraud under 18 U.S.C. §§ 1341–42 and two counts of retaliating against a witness, victim, or an informant under 18 U.S.C. § 1513(e). He appeals several of the district court's pretrial rulings—including its decision to move forward with the jury selection process despite Higgins's fair-cross-section concerns—and the order of restitution. We find no error in the challenged pretrial rulings but find that at sentencing, the district court did not adequately explain the basis for the restitution amount. Therefore, for the reasons that follow, we **AFFIRM** Higgins's convictions, **DENY** the motions to

supplement the record, **VACATE** Higgins's sentence as it pertains to restitution, and **REMAND** for reconsideration of the restitution order.

I.

In 2007, Higgins bought a house in Dayton, Ohio, which he financed with a $900,000 mortgage. By April 2010, Higgins had defaulted on his mortgage payments and, as of October 2016, still owed almost all that he had borrowed ($891,335.37). On top of that, the house was encumbered with about $815,000 in liens, including for federal taxes over the years.

Nationstar Mortgage, LLC ("Nationstar") became Higgins's mortgage servicer in July 2013. Because Higgins had no active homeowners' insurance, Nationstar took out a forced-placed[1] insurance policy on its own behalf for Higgins's residence. Nationstar paid the forced-placed policy's insurance premiums. And as the primary insured, Nationstar would receive the proceeds related to any insurance claim.

In July 2014, Higgins's 1,000-gallon fish tank sprang a leak and caused significant damage to the home. Higgins filed a claim with Nationstar's insurance provider a few days later and met with a claims adjuster. The insurer calculated the restoration costs at $132,613.14 and transferred funds to Nationstar. In turn, Nationstar planned to release the funds to Higgins in three stages to pay for the necessary repairs. After the first disbursement, Nationstar conditioned future transfers on Higgins demonstrating adequate progress on the repairs during routine inspections. Higgins signed a "Certificate of Intent to Repair" contract affirming that he would use the insurance proceeds solely to repair the house.

---

[1] As described at trial, "[f]orced-placed [home] insurance is insurance placed on [a] residence by the mortgage servicer because there is no indication that the homeowner has taken out insurance on the property."

The contract allowed Higgins to use a licensed contractor of his choice for the renovations. Higgins commissioned Michael Marshall and Scott Waters, contractors and owners of United Demolition, to do the work. But during their initial consultation, Higgins detailed his plan to divert the home repair funds for his own personal use. Higgins asked the contractors to help him with his plan by falsifying documents to procure the insurance monies. Unbeknownst to Higgins, however, the contractors were confidential informants for the FBI on an unrelated matter. And after their first meeting with Higgins, Marshall and Waters told the government about his plan to commit insurance fraud. The contractors audio- and video-recorded all subsequent meetings with Higgins. They also purported to aid Higgins's plan to defraud Nationstar and the insurance company—including by entering a bogus contract with Higgins and performing superficial repairs on his home so he could obtain additional disbursements.

Higgins was initially indicted for mail fraud, wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341, 1343 and 2 in April 2019. But after learning of the contractors' roles in the government's investigation, Higgins filed a pro se lawsuit in Ohio state court against them both, highlighting their roles as informants and alleging that they were the ones who defrauded Nationstar and the insurance company. This led the government to obtain a superseding indictment which added two counts of witness tampering and two counts for retaliating against a witness, in violation of 18 U.S.C. §§ 1512(d) and 1513(e).[2]

Higgins proceeded to a jury trial on January 10, 2022. The jury found Higgins guilty of three counts of mail fraud and two counts of retaliating against a government witness. The court sentenced him to an aggregate of 3 years' imprisonment and ordered him to pay $84,113.04 in restitution.

---

[2] The wire fraud count—previously Count Four—was dropped in the (final) Fourth Superseding Indictment.

Higgins now appeals numerous rulings of the trial court. His claims fall into three baskets. First, he challenges several pretrial evidentiary rulings, as well as the district court's denial of his motions for additional expert funds and to withdraw counsel. Second, he calls into question the trial court's jury selection process, arguing that its pandemic-era, jury-duty policy disproportionately excluded African-American prospective jurors from his jury venire, resulting in a due process violation. And third, Higgins disputes the court's restitution calculation. We address each issue in turn.

II.

*Pretrial Rulings.* Higgins asserts that the court made several erroneous pretrial decisions which—considered individually or cumulatively—rendered his trial fundamentally unfair. Each of his arguments fails.

A.  Expert Opinion Testimony

To counter the mail-fraud charges he faced, Higgins retained Chris Johnson to testify as an expert about standard practices in the insurance industry. The government filed a motion challenging portions of Johnson's proffered testimony, which Higgins opposed. After conducting a hearing, the district court excluded some of Johnson's testimony as irrelevant and some for its potential to confuse the jury. Higgins contends that the court abused its discretion by limiting Johnson's third, sixth, seventh, and eighth opinions on relevancy grounds.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. To be admissible, such testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also, e.g.*, *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020). *Daubert v. Merrell Dow Pharmaceuticals, Inc.* instructs that this requirement "goes primarily to relevance." 509 U.S. 579, 591 (1993). Whether an expert's proffered testimony is

relevant depends on the specific issues presented in each case. *Id.*; *Madej*, 951 F.3d at 370. While the "relevancy bar is low," the proffered evidence must "logically advance[] a material aspect of the proposing party's case" to be considered relevant. *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017) (citation and internal quotation marks omitted). Federal Rule of Evidence 403 also plays a role in this inquiry in that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." *Id.* at 444.

We review a district court's decision to exclude expert testimony for an abuse of discretion. *United States v. Anderson*, 67 F.4th 755, 767 (6th Cir. 2023) (quoting *United States v. Gardner*, 32 F.4th 504, 519 (6th Cir. 2022)). District courts abuse their discretion only when their rulings leave the reviewing court "with a definite and firm conviction that [the district court] committed a clear error of judgment." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (quoting *Conwood Co., L. P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002)).

*Opinion 3*. Johnson's third opinion discussed, in large part, the common understanding of the concept of actual cash value, or "ACV" and its application in the insurance industry. The district court generally took no issue with that portion of his expert report. But part of the opinion also addressed the scope of Higgins's contractual obligations to Nationstar under the mortgage agreement. The court found Johnson's interpretation of contractual language irrelevant to Higgins's defense and prohibited him from testifying about it.

We agree. The terms of Higgins's mortgage had no bearing on the underlying question of whether he committed fraud through the mail, so introducing such testimony would have unnecessarily confused the jury by suggesting that they did. *See, e.g.*, *United States v. Fallon*, 61 F.4th 95, 109 (3d Cir. 2023) (affirming exclusion of contract expert's testimony in a mail fraud

case because the expert "would inevitably [and wrongly] cause the jury to believe that . . . contractual terms were at issue in the case"). Opinion testimony that would confuse the jury violates Rule 702's requirement that such testimony assist the trier of fact in understanding the evidence or in determining a fact in issue. The district court's ruling narrowly prohibited Johnson from providing his interpretation of an immaterial mortgage contract. And as for Higgins's concern that the jury be permitted to hear from Johnson about how someone like Higgins "might [have] believe[d] he was owed money" (Dkt. 24, Appellant Opening Br., at 31) during the complicated claims process, Johnson's testimony included just such an explanation. As such, the court did not abuse its discretion in limiting Johnson's third opinion.

*Opinions 6 and 7.* The relevant portions of Johnson's sixth and seventh opinions concerned the fact that Nationstar and the insurer failed to detect Higgins's fraud during periodic inspections. Johnson intended to testify, for example, that if the companies "failed to properly inspect . . . the work being performed [on Higgins's property], then that is a failure solely attributable to them." The district court disallowed this and similar statements from Johnson's opinion—explaining that they essentially shifted blame to the victims, which would confuse the issues before the jury.

Whether Nationstar initially missed Higgins's fraud was not material to the question of Higgins's guilt or innocence. A victim's own gullibility or even negligence is no defense to criminal fraud; instead, as our sister circuits have observed, the focus is on *the defendant's* conduct. *See United States v. Serfling*, 504 F.3d 672, 679 (7th Cir. 2007) ("[T]he perpetrator of a fraud may not defend himself by blaming the victim for being duped."); *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (noting that the focus in a mail fraud case "is on the violator"); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (holding that a mail fraud victim's "gullibility" is irrelevant). Allowing Johnson to comment on Nationstar's purportedly inept oversight of its

disbursements would have only distracted the jury from the important questions at hand. Thus, the district court properly exercised its discretion in excluding that portion of his testimony.

Higgins insists nonetheless that Opinions 6 and 7 were critical to his defense because they established that Nationstar was not "actually deprived of money." (Dkt. 24, Appellant Opening Br., at 28). But his argument on this point is critically underdeveloped. He does not explain how Johnson's excluded testimony about the companies' failure to uncover the fraud shows that they suffered no actual loss. And to the extent Higgins means to argue that Johnson's testimony would have demonstrated that there was no fraud at all (i.e., Nationstar was pleased with the renovations because they were proceeding in good faith), the argument fails. Johnson did not opine, for example, that the repairs were in fact well done based on his review of the evidence. Instead, he opined on *Nationstar's* subjective assessment of the quality of the repairs. The district court properly found that this waded too far into contributory negligence (or victim blaming) territory to be admissible.

*Opinion 8*. Johnson's eighth opinion discussed a letter the insurance company sent to Higgins accusing him of fraud. Highlighting that the letter contained inaccuracies, Johnson suggested that the insurer conducted an unsatisfactory investigation into Higgins's alleged misconduct. The district court barred this portion of Johnson's report because it again passed blame to a victim of Higgins's fraud. The court added that Opinion 8 confused the issues since Higgins was indicted for mail fraud and not common law insurance fraud.

We find no abuse of discretion in the district court's ruling. Johnson's opinions about the quality of the insurance company's investigation were irrelevant to his prosecution. And Higgins's attempt to bridge the gap by contending that the government relied on the insurance company's internal investigation for the indictment against him is without support. Indeed, the record

demonstrates that the government began its own independent investigation into Higgins's scheme approximately six months before the insurance company sent the letter that formed the basis of Johnson's opinion. The court did not abuse its discretion in excluding Opinion 8.

### B. Motions for Co-Counsel & Expert Funds

The district court appointed a lawyer for Higgins's defense pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A, in March 2020. His lawyer later moved the court to appoint co-counsel due to voluminous discovery, which included approximately 1,000 pages of bank records. At the motion hearing, counsel emphasized that she had "done all the heavy lifting" in reviewing the record and "merely . . . need[ed] somebody to help facilitate at the trial." Although the court denied that motion without prejudice, it indicated that it would entertain an alternative request for an expert witness to help review the discovery. Higgins's attorney subsequently moved for funds to retain an expert accountant specializing in fraud examination "to aid [her] in understanding some transactions." The court held a hearing to consider that motion and to reconsider the motion for co-counsel. It simultaneously granted Higgins's request for a second attorney and denied the motion for additional expert funds. Higgins now argues that the court abused its discretion in denying him CJA funds to hire an expert fraud examiner.

Under the CJA, counsel for a defendant who cannot afford expert services "necessary for adequate representation may request them in an ex parte application." 18 U.S.C. § 3006A(e)(1). The defendant must establish that (1) the expert's services are "necessary to mount a plausible defense" and (2) his "case would be prejudiced" absent the court's authorization of funds. *United States v. Gilmore*, 282 F.3d 398, 406 (6th Cir. 2002). Under this standard, "[a] district court need not grant an indigent's motion under § 3006A on the off chance that the requested services might

turn up something." *Id.* We review the district court's decision to deny a request for expert services for abuse of discretion. *Id.*

Higgins claims the defense team was unable to understand the financial records without an expert fraud examiner because the records were voluminous and involved transactions between multiple financial institutions. But reviewing bank account statements is often integral to criminal defense work in cases involving financial crimes. And lawyers routinely perform document reviews. To be sure, such reviews can be tedious and difficult. But the record does not suggest that the discovery materials involved here fell outside the realm of ordinary financial transaction documents such that Higgins needed an expert to raise a plausible defense. On appeal, he points to a government witness's testimony describing "when Higgins received checks from Nationstar and United Demolition" and "how [he] spent the insurance money." (Dkt. 24, Appellant Opening Br., at 23). However, these are not the kind of sophisticated forensic inquiries that an attorney—much less two attorneys—cannot perform independently. We have upheld denials of CJA funds under similar circumstances. *See, e.g., United States v. Darwich*, 574 F. App'x 582, 595 (6th Cir. 2014); *United States v. Miller*, 371 F. App'x 646, 648–49 (6th Cir. 2010); *see also United States v. Pacheco*, 466 F. App'x 517, 522 (6th Cir. 2012) (finding no abuse of discretion in denying CJA funds where the defendant received other resources allowing him to raise a plausible defense); *United States v. Jamieson*, 427 F.3d 394, 408 (6th Cir. 2005) (same). Moreover, Higgins's CJA counsel informed the court at the first motion hearing that she had already worked through the discovery and merely wanted support at trial. The court's provision of a second attorney to assist with trial—including evaluating and marshaling the relatively unsophisticated financial documents involved here—met that need. We therefore conclude that the trial court did not abuse its discretion when it denied Higgins's motion for additional CJA funds to hire an expert accountant.

Higgins resists this conclusion by arguing that he required an expert to rebut the testimony of FBI fraud examiner, Susan Sigler. But Sigler merely served as a summary witness. She did not testify as an expert pursuant to Fed. R. Evid. 702. And even if she had, § 3006A(e)(3) would not entitle Higgins to a counter-witness to the government's expert. *See e.g.*, *United States v. Nixon*, 802 F. App'x 925, 928 (6th Cir. 2020). The question boils down to whether Higgins required an expert to mount a plausible defense; he did not. Nor was he prejudiced by the denial. The court appointed two defense attorneys who had ample time to prepare for Sigler's cross examination and otherwise defend his case. Higgins also enjoyed the CJA-funded services of insurance industry expert Chris Johnson as previously noted. On this record, there was no basis for the district court to find that Higgins could not mount a plausible defense without the additional services he sought.

## C. Rule 404(b) Evidence

The government filed several motions *in limine* ahead of trial, which Higgins opposed. The court granted the motions in relevant part under Fed. R. Evid. 404(b). On appeal, Higgins challenges the district court's decision to admit two kinds of evidence against him under Rule 404(b): (1) documents concerning liens on his home at the time of his insurance claim and (2) recordings[3] capturing Higgins's statement that a person accused of wrongdoing should "flip" and "reverse" the charges on his accuser.

Evidence of other wrongs or acts is not admissible to prove a person's character, and that "the person acted in accordance with [his] character" on another occasion. Fed. R. Evid. 404(b)(1). Yet, such evidence may be admissible for other purposes—such as to prove a person's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

---

[3] The parties and the district court variously refer to a singular "recording" or plural "recordings" as the subject(s) of the government's motion *in limine*. Because there is some ambiguity, we err on the side of inclusivity and refer to "the recordings."

Fed. R. Evid. 404(b)(2). And Rule 404(b) generally favors the inclusion, rather than exclusion, of evidence. *United States v. Miller*, 227 F. App'x 446, 457 (6th Cir. 2007) (citing *United States v. Myers*, 102 F.3d 227, 234 (6th Cir. 1996)).

"[T]here is an 'on-going dispute in this circuit concerning the proper standard of review of Rule 404(b) evidence.'" *LaVictor*, 848 F.3d at 444–45 (quoting *United States v. Carter*, 779 F.3d 623, 625 (6th Cir. 2015)). Sometimes this court has reviewed the admission of such evidence solely for abuse of discretion, and other times it has undertaken a three-part inquiry that applies different standards of review for each stage of analysis. *Id.*; *United States v. Iossifov*, 45 F.4th 899, 918 (6th Cir. 2022) (citing *United States v. Lattner*, 385 F.3d 947, 955 (6th Cir. 2004)). We need not decide which approach prevails because even applying the "more lenient" three-prong inquiry, *see LaVictor*, 848 F.3d at 445, there is no basis to reverse the district court's 404(b) rulings in this case.

Our first question under that inquiry is whether the district court clearly erred in finding that there was sufficient evidence that the other acts took place. *See Iossifov*, 45 F.4th at 918. Second, we review de novo "whether those 'other acts' are admissible for a proper purpose under Rule 404(b)." *Id.* Third, we review, for abuse of discretion, the district court's determination that the other acts evidence is not more prejudicial than probative under Federal Rule of Evidence 403. *Id.*; *see also* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."). "'Unfair prejudice' . . . means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (citation omitted). "In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable

probative force and its minimum reasonable prejudicial value." *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir. 2006) (cleaned up).

*Liens*. Higgins first challenges the district court's decision to admit evidence of about $815,000 in liens that were on his residence when he filed his insurance claim. He insists that this evidence served no legitimate purpose and was more prejudicial than probative.

The trial court permissibly admitted evidence of the liens. To begin, Higgins placed both his general and specific intent at issue when he pleaded not guilty to the mail fraud charges. *Lattner*, 385 F.3d at 957. Evidence of a defendant's financial condition is relevant and admissible for the proper purpose of establishing motive or intent in cases involving financial crimes. *See United States v. Cody*, 498 F.3d 582, 590–91 (6th Cir. 2007); *United States v. Bates*, 146 F. App'x 795, 798–99 (6th Cir. 2005). Higgins's significant financial woes revealed an incentive for him to use insurance monies for his own purposes rather than their intended purposes. Trial testimony bore this out; the contractors explained how Higgins misappropriated the insurance funds for personal business ventures. Higgins does not contest the existence of the liens, but instead counters that the liens did not meaningfully diminish his incentive to properly repair the house since he still lived there. But this argument goes to the weight of the evidence, not its admissibility. And, as noted, Rule 404(b) "is a rule of inclusion, not exclusion." *Myers*, 102 F.3d at 234. All things considered, even on de novo review, we find the district court permitted admission of this evidence at trial for a proper purpose under the Rule.

The district court also fairly concluded that the probative value of the evidence of the liens was not substantially outweighed by the risk of unfair prejudice. The total owed in liens almost doubled Higgins's indebtedness relating to the house, and he had defaulted on the mortgage. Together, these facts showed a high level of financial stress and were highly probative of his

motive or intent to defraud Nationstar, which was not substantially outweighed by any risk of undue prejudice. *E.g.*, *Cody*, 498 F.3d at 590–91. Indeed, nothing about the liens would have caused the jury to infer guilt on an improper basis. *Old Chief*, 519 U.S. at 180. Higgins argues that the liens were overly prejudicial because they cast him as someone who could not be trusted with money. But affording this possible reputational harm its "minimum reasonable prejudicial value," as we must, it does not overcome the probative force of the evidence. *United States v. Guzman*, 571 F. App'x 356, 360 (6th Cir. 2014). In short, the district court did not abuse its discretion in admitting evidence of the liens under Rule 404(b).

*Recordings*. In 2014, Higgins was captured in audio recordings counseling a confidential informant on how to respond to allegations of misconduct in an unrelated matter. In the recording, he encouraged the informant to "flip" and "reverse" those allegations against his accuser. (R. 63, Mtn. *in limine*, at PageID 397). The government moved to introduce the recordings to prove retaliatory intent and common plan in relation to the witness retaliation charges. Over Higgins's objection, the court admitted the recordings under Rule 404(b). Like the existence of the liens, Higgins does not contest the occurrence of the statements captured on the recordings. Rather, on appeal, Higgins maintains that the evidence served no legitimate purpose and was unfairly prejudicial because the 2014 recordings were too temporally remote from his 2020 civil lawsuits against the government's witnesses to be probative of his intent, and therefore they were not admissible for any proper purpose.[4]

The parallel between Higgins's earlier advice to another person to flip and reverse allegations of wrongdoing against an accuser of that person and his later actions in accusing

---

[4] The government contends that Higgins failed to preserve this argument for appellate review, and that we should therefore review this part of the district court's decision for plain error rather than de novo. Higgins's claim fails regardless of the standard of review applied, so we need not decide this point.

witnesses in his own case of the very crimes for which he stood trial is striking. But were the statements too long ago to reflect his intent in this case? Witness retaliation is a specific intent crime. *See* 18 U.S.C. § 1513(e); *See also United States v. Edwards*, 783 F. App'x. 540, 543 (6th Cir. 2019) (recognizing that intent to retaliate is required under § 1513(e) and may be inferred from circumstantial evidence). But to infer intent from Higgins's earlier statements, the recorded statements must have been "relate[d] to conduct that [was] . . . reasonably near in time to the . . . offense at issue." *Carter*, 779 F.3d at 625 (citation omitted). As an initial matter, we have consistently observed that there is "no absolute maximum number of years that may separate a prior act and the offense charged." *LaVictor*, 848 F.3d at 447 (internal quotations and citation omitted); *United States v. Asher*, 910 F.3d 854, 861 n.4 (6th Cir. 2018); *United States v. Jones*, 403 F.3d 817, 821 (6th Cir. 2005). Recognizing that precept, we have affirmed the admission of prior act evidence where the time between the prior act and the defendant's conduct for which he is on trial spanned as long as eight years. *E.g.*, *United States v. Love*, 254 F. App'x 511, 516 (6th Cir. 2007); *United States v. Persinger*, 83 F. App'x 55, 59 (6th Cir. 2003). Higgins's recorded statements occurred just six years before the conduct at issue—his 2020 lawsuit against Marshall and Waters. While not extremely recent, the recordings were made reasonably near in time to when Higgins filed his lawsuit to be deemed admissible.[5]

Lastly, we find that the recordings were not unfairly prejudicial because, as he contends, a lay juror might believe his statements "resemble[d] a confession" to the witness retaliation charges. (*Id.* at 38). In our view, no reasonable juror would interpret Higgins's recorded statements as an admission of guilt to the charges. The foremost reason is because the recorded statements well-

---

[5] Because the recordings served the proper purpose of probing Higgins's intent, the court need not address his alternative argument that they fail as *modus operandi* evidence.

predate his filing of the retaliatory lawsuit underlying the charges for which he faced trial and any known interactions with the witnesses here. Moreover, as Higgins himself observes, he made the recorded statements in a different context, where he was advising someone to retaliate against unrelated accusations of wrongdoing. Given this context, any reasonable juror would understand that his statements were not *confessions* to any of the crimes charged. Rather, they would grasp that this evidence might shed light on Higgins's possible intent in filing suit against the contractors. Consequently, there was minimal risk that the jury would convict Higgins because of uncharged misconduct. *See Asher*, 910 F.3d at 861. At the same time, the recordings were highly probative of Higgins's intent since he essentially "flipped" and "reversed" the charges in his indictment against the contractors after learning they had informed against him to the government. Recognizing this probative value and acknowledging the broad discretion afforded to the district court in this context, we find no abuse of discretion in the court's admission of Higgins's recorded statements.

### D. Motion to Withdraw

About three weeks before trial, Higgins told his attorneys he did not believe they were effectively representing him. Counsel responded by filing a one-page motion to withdraw. In it, they informed the court that "the attorney-client relationship has indeed reached an irreparable impasse."

The district court held a motion hearing on January 5, 2021. There, Higgins also broadly stated that he wanted to fire his CJA attorneys because of "our relationship." (*Id.* at PageID 1236:5–17) At the same time, Higgins recognized that CJA counsel "are more than decent attorneys" and thanked the court for appointing them. He also explained that he never missed a call or an appointment with counsel.

For their part, Higgins's lawyers expressed frustration with their client. They explained that their relationship with Higgins had become adversarial and "failed very mutually" due to his fixation on specific irrelevant issues. Counsel also informed the court that they had made every effort to prepare for trial the following week despite these circumstances.

The government stated it was fully prepared to go to trial, and argued that granting the motion would be fruitless, particularly since Higgins's former counsel "had very similar issues" with him. From the government's perspective, "[t]his appear[ed] to be a Mr. Higgins issue, not a defense counsel issue." (*Id.*)

The district court denied the motion to withdraw. Although Higgins and his attorneys experienced some "unfortunate developments in the attorney-client relationship," the court found that those issues "[did] not call for granting the motion to withdraw at this late stage of the case" given Higgins's imminent trial.

Once a defendant brings "any serious dissatisfaction with counsel to the attention of the district court," the court has a duty to inquire into the source and nature of that dissatisfaction. *Benitez v. United States*, 521 F.3d 625, 632, 634 (6th Cir. 2008) (quoting *United States v. Iles*, 906 F.2d 1122, 1131–32 (6th Cir. 1990)). The court may grant a motion to withdraw or for substitute counsel if there is a showing of good cause upon further inquiry. *Id.* at 632. We generally consider four factors in reviewing the denial of such a motion: "(1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) balancing the factors with the public's interest in the prompt and efficient administration of justice." *United States v. Steele*, 919 F.3d 965, 973 (6th Cir. 2019) (quoting *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001)); *see also Martel v. Clair*, 565

U.S. 648, 663 (2012). The decision whether to allow the withdrawal or substitution of counsel is committed to the sound discretion of the trial court and is entitled to deference absent an abuse of that discretion. *Martel*, 565 U.S. at 663–64; *United States v. Trujillo*, 376 F.3d 593, 606 (6th Cir. 2004). Balancing the four factors set out above, we affirm the district court's ruling.

First, all things considered, defense counsels' motion to withdraw was timely. *See, e.g.*, *United States v. Trevino*, 7 F.4th 414, 428–29 (6th Cir. 2021); *United States v. Collado-Rivera*, 759 F. App'x 455, 466 (6th Cir. 2019); *United States v. Powell*, 847 F.3d 760, 778, 780 (6th Cir. 2017). Though trial was scheduled a mere three weeks away, defense counsel explained at the motion hearing that the events that caused a breakdown in the attorney-client relationship had only recently transpired. Counsel filed the motion within 30 days of issuance of the fourth superseding indictment. The record does not suggest there was undue delay in filing the motion after the purported breakdown. Indeed, there does not appear to have been any significantly earlier time when the defense team could have alerted the court to Higgins's dissatisfaction with his attorneys. We therefore cannot say that the motion was untimely, despite being made a few weeks before trial. This factor weighs in Higgins's favor.

Second, the district court had a duty to inquire into the reasons Higgins sought to have his counsel removed. *Iles*, 906 F.2d at 1131. Courts "simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011) (citing *United States v. Vasquez*, 560 F.3d 461, 467 (6th Cir. 2009)); *see also* *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006); *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004). Here, the court did a great deal more than this.

During the hearing on his motion, the district court permitted Higgins to explain the perceived breakdown; the court allowed him to speak at length about his concerns and asked

Higgins follow-up questions. It also heard from Higgins's attorneys as well as the government's and allowed Higgins to respond to their comments— ultimately affording him the last word. Thus, the district court's inquiry satisfied its obligation. *E.g.*, *Marrero*, 651 F.3d at 465. The district court thoroughly explored the bases for Higgins's dissatisfaction with counsel. The hearing also served the important function of "eas[ing] the defendant's distrust" of his lawyers. *Iles*, 906 F.2d at 1131. This is because, among other things, the court reassured Higgins that it "appointed [him] the best attorneys that [it] could." (R. 140, Hrg. On Second Mtn. to Withdraw, at PageID 1236:18–21). Consequently, this factor weighs against Higgins.

Third, to establish good cause to substitute counsel, Higgins needed to show that he and his lawyers experienced a "total lack of communication preventing an adequate defense." *Powell*, 847 F.3d at 778. As we have found, "a lack of communication resulting from a defendant's refusal to cooperate with his attorney does not constitute good cause for substituting counsel." *Marrero*, 651 F.3d at 466. This means a defendant cannot create the need for substitute counsel—or force his attorney's hand in moving to withdraw—by thwarting his own attorney-client relationship. We also generally will not find good cause to substitute counsel where a new attorney would be similarly unable to resolve the defendant's complaints. For example, substitution is unwarranted where the "real disagreement" between an attorney and client "concern[s] whether to defy court orders" or file frivolous motions. *Trevino*, 7 F.4th at 429 (court orders); *United States v. Flynn*, 265 F. App'x 434, 441 (6th Cir. 2008).

Here, Higgins's own behavior caused the rift with his attorneys. Throughout the litigation—including at the hearing on the motion to withdraw—Higgins fixated on irrelevant concerns, and this fixation is what ultimately led to problems in the attorney-client relationship. Without question, the record reveals a less than ideal attorney-client relationship, and we recognize

the difficulties attendant to representation under such circumstances. But because *Higgins's own actions* compromised the relationship, this factor weighs strongly against him in our inquiry. *See Vasquez*, 560 F.3d at 468; *Marrero*, 651 F.3d at 466. Moreover, a different attorney would have had no better chance of aiding Higgins in pursuing the irrelevant issues he sought to raise as doing so would have required any newly appointed attorney to defy the district court's order excluding all evidence related to those allegations. There is no good cause for substitution under such circumstances. *See Trevino*, 7 F.4th at 429.

Even where there has been a breakdown in communications between attorneys and their client, counsels' continued representation at trial does not necessarily merit withdrawal or substitution. Absent a conflict "so great that it . . . *prevent[ed] an adequate defense*," there is no good cause to grant a motion to withdraw. *Marrero*, 651 F.3d at 466 (internal quotation marks omitted) (emphasis added); *see also* WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 11.4(b) (4th ed. 2022) ("[To establish good cause, a d]efendant must have some well-founded reason for believing that [his] attorney cannot or will not competently represent him."). Here, Higgins's "[t]rial counsel proved to be a vigorous advocate" during the proceedings below despite any breakdown. *Trevino*, 7 F.4th at 429; *see also, e.g.*, *Steele*, 919 F.3d at 975. Significantly, his attorneys were ready for trial when they filed the motion to withdraw. At the motion hearing, they informed the court that they had already done "everything possible to prepare for trial" and did so "to the best of [their] ability." The record amply supports that claim. The district court therefore had no reason to suspect that Higgins's attorneys—which it described as perhaps "the best attorneys that [it] could appoint" him, (*id.* at PageID 1236:19–21)—could not fulfill their duties in this case. His attorneys went on to represent him throughout a seven-day trial during which they called several witnesses for the defense, cross and re-cross-examined each of the government's

witnesses, and presented a 75-minute closing argument. These facts undermine Higgins's contention that he did not receive effective representation. Whatever communication issues Higgins and his attorneys were experiencing at the time of the motion hearing, they seem not to have persisted at trial as Higgins does not dispute the government's averment that the attorneys "routinely consulted" with Higgins at trial and asked follow-up questions at his request. On this record, there was no good cause for substituting counsel.

Finally, we find that the district court's denial of the motion was in the public's interest in the prompt and efficient administration of justice. *E.g.*, *Jones v. Bradshaw*, 46 F.4th 459, 475 (6th Cir. 2022); *Powell*, 847 F.3d at 779.

While Higgins's interest in retaining the counsel of his choice is a significant one protected by the Sixth Amendment, he lacked good cause to replace his CJA attorneys. Granting the motion and providing time for a new attorney to become acquainted with Higgins's case likely would have caused further considerable delay in a case that had already spanned three years. Counsel on both sides were ready to proceed to trial, and witnesses had arranged to attend court. Furthermore, as discussed, appointing new counsel would not have solved Higgins's concerns, given his intransigence on an issue that the district court had already excluded from consideration at trial. Under such circumstances the public's interest in prompt and efficient justice would have been unnecessarily disturbed had Higgins's motion been granted.

Considering all of the factors together, we cannot say that the district court abused its discretion in denying Higgins's motion to withdraw. Accordingly, we affirm the district court.

### E. Cumulative Error

Finally, Higgins argues that even if the district court's pretrial rulings were harmless in isolation, they cumulatively produced a fundamentally unfair trial—and that this violated his due

process rights under the United States Constitution. However, "cumulative error cannot lie where individual errors do not exist." *United States v. Cramer*, 491 F. App'x 520, 529 (6th Cir. 2012); *see also United States v. Wheaton,* 517 F.3d 350, 372 (6th Cir. 2008) (explaining that the cumulative error analysis looks to "actual errors, not non-errors"). Because we find that the district court committed no errors on the grounds alleged by Higgins, his cumulative error argument necessarily fails. *Cramer*, 491 F. App'x at 529.

### III.

*Jury Selection Process.* Higgins next asserts that the district court violated his Sixth Amendment rights by proceeding with a jury venire containing no black people, and which therefore was not a fair cross-section of the community. He attributes the lack of a fair cross-section to the Southern District of Ohio's pandemic-era jury-selection policy. This policy allowed prospective jurors to ask to be excused from service if they were, or lived with someone who was, at high risk of COVID-19 infection. General Order 20-17, Appendix IV ("Sample Statement: Coronavirus (COVID-19) Message to Jurors") (May 29, 2020), https://www.ohsd.uscourts.gov/sites/ohsd/files/General%20Order%2020-17.pdf [https://perma .cc/4YAB-4VPE] (last accessed August 14, 2023). The General Order is facially neutral. But Higgins argues it systematically excluded black potential jurors due to the disproportionate hardship the pandemic worked on black communities as compared to other racial groups. He seeks to have his conviction vacated on this ground.

"[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial" and "fundamental to the American system of justice." *Taylor v. Louisiana*, 419 U.S. 522, 528, 530 (1975). Generally, this court reviews de novo the question of whether a defendant was deprived of his right to a jury

selected from a fair cross-section of the community. *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008). But it reviews such claims for plain error where a defendant did not properly preserve the issue for appeal. *United States v. Gyamfi*, 805 F.3d 668, 672 (6th Cir. 2015). To establish plain error, a defendant must show (1) a trial error, (2) that was plain, (3) that affected his substantial rights, and (4) that "seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732–36 (1993) (internal quotation marks and citation omitted).

Higgins did not adequately preserve his fair-cross section claim for our review. The thrust of his argument in the district court was that public-health concerns posed by the COVID-19 pandemic counseled against proceeding with trial. Higgins failed to sufficiently allege any elements of a fair-cross-section claim to preserve those arguments for appeal. We therefore review for plain error.

To establish a prima facie violation of the fair cross-section requirement, a defendant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Higgins did not develop the factual basis for this claim at trial. In particular, analysis of population data is key to satisfying *Duren*'s second element. *See Odeneal*, 517 F.3d at 412. Yet Higgins presented no such evidence. In fact, counsel declared during argument before the district court, "I am not here with a brief full of social science and numbers." (R. 143, Trial Tr., at PageID 1424:25–1425:1). Higgins's efforts to supplement the record on appeal, as discussed more fully

below in our consideration of Higgins's motion in that regard, is too little too late; we are limited to reviewing the record as it stood in the trial court. *See* Fed. R. App. P. 10(a) (constraining the record on appeal to "the original papers and exhibits filed in the district court," "the transcript of proceedings, if any," and the district court's docket entries); *see also United States v. Husein*, 478 F.3d 318, 335–36 (6th Cir. 2007). As to the first *Duren* prong, Higgins broadly alerted the district court to the lack of diversity in his jury pool. But he never zeroed in on the grounds for this objection. Instead, he variously noted that the venire lacked (a) any people of color (b) two black potential jurors who had been summonsed for jury duty but did not attend, and (c) people of certain political persuasions. Significantly, Higgins did not argue at the trial level that African-Americans, as a group, were excluded from the jury pool. And his argument that no *people of color* were present in his venire did little to preserve the claim now before the court; as trial counsel recognized, the phrase "people of color" reflects a much broader demographic profile than the black community alone.

Nor did Higgins argue below that any alleged underrepresentation was caused by their "systematic exclusion" from the jury selection process. Higgins narrowly focused on *his own* jury pool rather than in the district's venires at-large. What's more, he repeatedly attributed his jury's demographics to the ongoing COVID-19 pandemic rather than any action taken by the district court. He never tied his concerns to the district court's jury selection process as *Duren* requires.

We therefore conclude the district court did not err when it rejected Higgins's unsupported allegations pertaining to COVID-19 and the composition of his jury venire. *Gyamfi*, 805 F.3d at 671.

One final note. Higgins has also filed two related motions to supplement the record on appeal. Through these motions, he seeks to introduce sweeping new evidence about the Southern

District of Ohio's composition and selection of jury pools for us to consider in the first instance. He argues that this Court must either consider this evidence under Fed. R. App. P. 10(e) or take judicial notice of it because (1) the statistical information is both reliable and accurate, (2) he could not have presented this information sooner because it did not exist at the time of trial, and (3) public policy favors the expansion of the record. We are not persuaded.

First, Rule 10(e) is a corrective measure that permits this Court to supplement the record on appeal if there is a dispute about whether the record discloses what occurred in district court or "if there is any omission or misstatement" in the record caused "by error or accident." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 676–77 (6th Cir. 2013). Higgins makes no argument regarding the record's accuracy. And we discern no grounds to find that Rule 10(e) applies. Second, we have previously declined to take judicial notice of new evidence that a party could have presented below but failed to do so. That approach is appropriate here. *See Bormuth v. County of Jackson*, 870 F.3d 494, 501 (6th Cir. 2017). Although Higgins argues that the information regarding the impact of COVID-19 on jury selection "did not yet exist," because his trial was the first to occur in the Southern District of Ohio-Dayton Division after the pandemic's onset, he admits that he failed to offer the district court *any* factual evidence whatsoever—such as statistical evidence demonstrating pre-pandemic levels of representation—to support his claim. Thus, we find that he may not use judicial notice as a method to "burnish the record on appeal" after failing to make an evidentiary run at a factual basis for this argument below. *Bormuth*, 870 F.3d at 501.

IV.

*Restitution.* Higgins's final challenge is to the district court's May 25, 2022, order of restitution. In the afternoon of May 23, 2022, U.S. Probation filed an addendum to its presentence report advising that the government had submitted a restitution request of $84,113.04 and

recommending that Higgins be required to pay restitution in the amount the government requested. The recommended amount equaled the total funds Higgins diverted from the insurance disbursements. Higgins filed a memorandum in opposition just after midnight on May 25, 2022, and an amended memorandum around 9 a.m. that same day. He asserted that the government's restitution request did not reflect Nationstar's actual loss because he had used some of the insurance funds "to complete significant repairs on the home." Higgins maintained that "the actual loss to [Nationstar could] only be calculated in terms of the diminished value to the home in question as a direct result of the diversion" rather than in terms of his own financial gain (i.e., the sum of the diverted funds). Higgins requested a restitution hearing to help resolve the dispute.

The sentencing hearing commenced later that same morning on May 25. The court did not hold a separate restitution hearing but broadly invited the parties to speak about any issue related to Higgins's sentencing. The government briefly defended its restitution request while the defense rested on the papers. The court then summarily ordered $84,113.04 in restitution to Nationstar— the exact amount requested by the government. It did not discuss its rationale for this decision. And it never addressed Higgins's arguments in opposition on the record. Higgins argues on appeal that the district court miscalculated the restitution award by relying on his financial gain rather than Nationstar's actual loss.

The Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, requires the district court to award restitution to victims of fraud. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). Restitution must be awarded "in the full amount of each victim's losses." *Id.* at § 3664(f)(1)(A). That said, restitution "is intended to compensate victims only for losses caused by the conduct underlying the offense of conviction." *United States v. Hills*, 27 F.4th 1155, 1202 (6th Cir. 2022) (quoting *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015) (internal quotation marks

omitted)). In other words, restitution awards must reflect the victim's "actual losses." *Kilpatrick*, 798 F.3d at 388. Notably, a defendant's ill-gotten gains do not automatically serve as a proxy for a victim's losses. District courts therefore "may not use the defendant's gain to approximate the victim's loss unless the government establishes such a correlation that the defendant's gain can act as a *measure of—not a substitute for*—the victim's loss." *Hills*, 27 F.4th at 1202 (quoting *Kilpatrick*, 798 F.3d at 390); *see also United States v. Klein*, 543 F.3d 206, 215 (5th Cir. 2008) (remanding for resentencing where restitution amount reflected defendant's gross gain rather than victim-insurance companies' losses). The government bears the burden of proving the appropriate amount of restitution by a preponderance of the evidence. 18 U.S.C. § 3664(e). Such evidence "must have 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Sawyer*, 825 F.3d 287, 294–95 (6th Cir. 2016).

Once the court determines that a restitution order was permissible, the amount of restitution ordered by the district court is reviewed for an abuse of discretion. *United States v. Skouteris*, 51 F.4th 658, 674 (6th Cir. 2022). It is an abuse of discretion to order restitution based on an improper loss calculation. *United States v. Wymer*, 654 F. App'x 735, 756 (6th Cir. 2016) (citing *United States v. Joseph*, 914 F.2d 780, 785 (6th Cir. 1990) (per curiam)).

Under the MVRA, a district court generally must order restitution from a defendant convicted of certain offenses—including "any offense committed by fraud or deceit"—if he caused an identifiable victim to suffer a pecuniary loss. 18 U.S.C.A. §§ 3663A(a)(1), (c)(1). Higgins was convicted of a fraud offense and there is an identifiable victim in Nationstar. He therefore must pay restitution.

The only dispute is how the restitution amount should be calculated. Higgins says the district court abused its discretion by using his gross gain rather than Nationstar's actual loss to

calculate his restitution amount. He emphasizes, and the government does not dispute, that he spent at least some of the insurance money on home repairs. He posits that there is a dynamic relationship—rather than a one-to-one ratio—between any insurance funds put toward his home and its resultant fair market value. He therefore urges the court to find that the proper measure of restitution in this case is tied to the amount of the property's reduced market value attributable to his fraud. Higgins also contends that the court did not adequately explain its restitution order, which is another ground for remand. The government counters that Higgins's gain in misappropriated insurance monies corresponded to Nationstar's loss in this case. It asserts that "every dollar that didn't go into the house and the repair, equaled the diminution in value of . . . that property to Nationstar." (Oral Arg. Audio at 28:45–29:16). But the basis for this conclusion is not immediately evident. And somewhat in tension with that statement, is the government's proposition that fair market value is a relevant factor here; it cites trial testimony about lost property equity flowing from Higgins's misconduct and contends that the district court considered the "amount of restored home value" in its restitution order. (Dkt. 43, Appellee Br., at 67). If the property's market value is relevant, that fairly implicates the question raised by Higgins: whether there is "a direct correlation" between Higgins's gain and Nationstar's loss such that the former may serve as proxy for the latter. *See Kilpatrick*, 798 F.3d at 390. The government does not reconcile its seemingly conflicting positions on this point.

The parties' dispute about the proper method for calculating restitution is one that the district court should address in the first instance. District judges must "adequately explain [a] chosen sentence to allow for meaningful appellate review." *Gall v. United States*, 552 U.S. 38, 50 (2007). And we have previously explained that where a defendant "object[s] to a factual matter over which there [is] a genuine dispute between the parties," including with respect to a restitution

calculation, Fed. R. Crim. P. 32(i)(3)(B) requires the district court to explicitly "rule on the dispute or determine that a ruling is unnecessary." *United States v. Williams*, 612 F.3d 500, 517 (6th Cir. 2010); *see also United States v. Sexton*, 894 F.3d 787, 801 (6th Cir. 2018); *United States v. Mobasseri*, 828 F. App'x 278, 280 (6th Cir. 2020)[6] ("[T]he district court cannot . . . fail to provide any explanation whatsoever as to its restitution order."); *cf. United States v. Begay*, 33 F.4th 1081, 1097 (9th Cir. 2022) (remanding because the district court failed to adequately explain its restitution award, and a question existed whether the award reflected the victim's actual losses). In keeping with this tenet, in *Williams*, we vacated a restitution order where the district court "did not expressly rule" on the defendant's objection to the government's restitution calculation. 612 F.3d at 517. We did the same in *United States v. Mobasseri*, because the restitution order was entered "without any explanation at all of the particular amounts it ordered." 764 F. App'x 549, 549–50 (6th Cir. 2019) (citing *United States v. Butler*, 297 F.3d 505, 519 (6th Cir. 2002)). We reasoned that the district court's silence on this point "deprived [the defendant] of his 'right to meaningful appellate review'" and "affect[ed] the 'fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* Similar issues appeared in *United States v. Jones*, 747 F. App'x 348, 359–60 (6th Cir. 2018). There, the defendant objected to the government's restitution request. The district court ruled against the defendant without explanation, and he appealed. This court explained that the MVRA requires district courts to "resolv[e] uncertainties" and explain their restitution orders "with sufficient clarity to enable [appellate courts] to adequately perform [their] function on appellate review. *Id.* at 360. However, the district court "failed entirely to explain

---

[6] *Mobasseri* arose in the context of 18 U.S.C.A. § 2259—a mandatory restitution statute which applies in sexual exploitation cases. However, § 2259(b)(3) states that "[a]n order of restitution under this section shall be issued . . . in accordance with section 3664 in the same manner as an order under section 3663A." In other words, we analyze restitution orders pursuant to § 2259 and the MVRA using the same framework. *See also United States v. Mobasseri*, 764 F. App'x 549, 550 (6th Cir. 2019).

its . . . restitution award," which prevented "meaningful appellate review." *Id.* at 360–61. Accordingly, the case was remanded for resentencing. *Id.* at 361. The panel specifically instructed the district court to "give some reasoned explanation for its restitution award." *Id.*

Here, Higgins raised a material challenge to the government's restitution request—yet the district court ruled against him without explanation. At the very least, the district court did not explain its findings with sufficient clarity for us to adequately perform appellate review. We therefore vacate Higgins's sentence as it pertains to the restitution award only and remand for further proceedings. On remand, the district court may "(1) request the government to submit additional evidence; (2) hold an evidentiary hearing; and (3) conduct further proceedings limited to the restitution award consistent with this opinion." *Kilpatrick*, 798 F.3d at 390.

## V. Conclusion

For the foregoing reasons, we **AFFIRM** Higgins's convictions, **DENY** Higgins's motions to supplement the record as moot, **VACATE** his sentence, and **REMAND** for further inquiry as to the appropriate amount of restitution due to Nationstar.